Steven R. Weinmann (SBN 190956)
Steven.Weinmann@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:    (310) 943-0396

*Additional Counsel on Signature Page*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS AND DEBORAH MURPHY, individually, and on behalf of a class of similarly situated individuals,<br><br>             Plaintiffs,<br><br>        v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, TOYOTA MOTOR NORTH AMERICA, INC., a California corporation, and TOYOTA MOTOR CORPORATION, a Japanese corporation,<br><br>             Defendants. | Case No.: _<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1)   Breach of Implied Warranty under the Magnuson-Moss Warranty Act<br>(2)   Breach of Implied Warranty under Colorado law<br>(3)   Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq*.<br>(4)   Fraudulent Omission<br><br>**DEMAND FOR JURY TRIAL** |

1.     Plaintiffs Dennis and Deborah Murphy ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States ("Class Members") who purchased any 2017 to present Toyota Highlander or 2017 to present Toyota Sienna vehicles equipped with an 8-speed transmission ("Class Vehicles").

2.     Defendants Toyota Motor Sales, U.S.A., Inc., ("TMS,") Toyota Motor North America, Inc. ("TMNA,") and Toyota Motor Corporation ("TMC") (collectively, "Toyota" or "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

## INTRODUCTION

3.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

4.     Defendants manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' transmissions were defective.

5.     In around 2016, Toyota introduced a transverse, eight-speed transmission marketed and hereinafter referred to as the "Direct Shift-8AT" and designated by Toyota generally as the UA80 / UB80.[1]

6.     Since their release in the 2017 model year, the Toyota Sienna and certain Toyota Highlanders have been equipped with Toyota's UA80 transmission, which, on information and belief, is designated by the specific model numbers UA80E and UA80F.[2] This transmission was developed by

---

[1] UA80 is the designation used for six-cylinder vehicles, UB80 is the designation used for four-cylinder vehicles. On information and belief, the two variants are the same or substantially similar.

[2] UA80E is the model number for transmissions in forward-wheel drive Class Vehicles, and UA80F is the model number for transmissions in all-wheel drive Class Vehicles.

CLASS ACTION COMPLAINT

Toyota in a joint venture with Aisin AW, a third-party transmission manufacturer. As noted in Aisin's June 2019 summary of its major powertrain products, this high torque capacity transmission is for use in Toyota Highlander and Sienna vehicles.[3]

7.       Plaintiffs are informed and believe, and based thereon allege, that the Class Vehicles' Direct Shift-8AT Transmission is defective in its design and/or manufacture in that, among other problems, it causes harsh or delayed shifting and engagement, delayed acceleration, hesitation, jerking, unintended acceleration, lurching, excessive revving before upshifting (also known as excessively high RPM shift points), and lack of power when needed (such as from a stop) (the "8AT Transmission Defect").

8.       The 8AT Transmission Defect is inherent in each Class Vehicle and was present at the time of sale.

9.       Toyota developed the Direct Shift 8AT in a joint venture with Aisin AW, a third-party transmission manufacturer. On information and belief, in response to heightened consumer demand and governmental pressure to reach unprecedented miles-per-gallon ratings, Toyota attempted to create an 8-speed transmission for a compact, transverse application by using a single axis and only two planetary gears, rather than the typical four. Unfortunately, while Toyota touted the resulting Direct Shift 8AT transmission as "achieving one of the world's best transmission efficiencies" that "lower[] a vehicle's fuel requirements" and even improving "straight driving" and "cornering stability,"[4] in practice, the new transmission design causes harsh and delayed shifting, delayed and unpredictable acceleration, jerking forward, lack of power, and other symptoms listed *supra*.

_____

[3] *Available at* https://www.aisin-aw.co.jp/en/corporate/module/pdf/corporate/summary/index/data.pdf

[4] *Available at* https://global.toyota/en/powertrain/transmission/

CLASS ACTION COMPLAINT

10.     Despite these widespread and well-known problems, Toyota continued to market the Direct Shift 8AT Transmission not only as a fuel-efficient model, but one that would achieve "quick and smooth response to accelerator pedal operation" which would "create[] an 'as desired' direct driving feel..."[5]

11.     Although Defendants were sufficiently aware of the 8AT Transmission Defect from pre-production testing, design failure mode analysis, calls to the customer service hotline, and customer complaints made to dealers, this knowledge and information was exclusively in the possession of Defendants and their network of dealers and, therefore, unavailable to consumers.

12.     Despite access to aggregate internal data, Defendants have actively concealed the existence of the defect.

13.     The 8AT Transmission Defect is material because it poses a serious safety concern. For example, delayed acceleration, unpredictable engagement and shifting, jerking, lurching, unintended acceleration, excessive revving, and lack of power severely affect the driver's ability to control the car's speed, acceleration, and deceleration, and can make it difficult to safely operate the vehicle, including safely drive on a highway, merge into traffic or to turn left across incoming traffic.

---

[5] *Id.*

1    14.    For example, one owner of a 2019 Toyota Highlander complained to

2  the National Highway Traffic Safety Administration ("NHTSA") as follows

3  (NHTSA ID No. 11242822)[6]:

4         2019 Highlander XLE loses power, unable to accelerate,
          & jerks and stalls in traffic. Bought at 200 miles,
5         certified preowned. it is a nightmare vehicle.

6         Accelerator has been touchy and jumpy at times,
          intermittently at slow speeds. First time it stalled it
7         started to lose power put -put and chug like jerking and
          all dash and electrical on dash went out, unable to
8         accelerate, then stalled out in road, unable to steer or
          control vehicle. This occurrence was after a longer
9         period of driving. Second time it stalled out began to lose
          power, putter and chug, unable to accelerate applying gas
10        pedal, getting no gas, vehicle dies out, unable to steer or
          control vehicle. This occurrence was after a longer
11        period of driving. Third time was yesterday 8-8-19. Left
          work and about 5-7 minutes into my drive, started
12        hesitating, losing all dash and electrical power and will
          not accelerate when gas pedal applied, then stalls out,
13        unable to control the steering wheel again! Almost got
          hit this time, man behind me coming fast and had to
14        swerve into lane over to miss me. **This car is going to
          kill me or someone by causing an accident if they do
15        not get it fixed right**. After the second stall it was towed
          into dealership and they were not sure but said fuel
16        pressure was reading 22 and was supposed to be in the
          mid to high 50's. They replaced the fuel pump and it
17        drove ok for a little while but I noticed the average fuel
          mileage going down from an approx in city 19.1--20 to
18        17.1-17.3. has never been so low so obviously the
          stalling and the replacing or the fuel pump are not the
19        real issue. Fuel economy going down since replacement
          of the fuel pump and now another dangerous stalling
20        issue. Car is at toyota dealer now. **They need to dive
          much deeper & resolve this very dangerous safety
21        issue! i bought this car to feel safe and have reliable
          transportation and have neither. it really scares me**.
22        *dt*jb.

23        (emphasis added).

24

25

26
          _____

27        [6]  Spelling and grammatical errors in consumer complaints reproduced
       herein remain as found in the original.
28

CLASS ACTION COMPLAINT

15.    Had Defendants disclosed the 8AT Transmission Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

## THE PARTIES

**Plaintiffs Dennis and Deborah Murphy**

16.    Plaintiffs Dennis and Deborah Murphy are Florida citizens who reside in Sarasota, Florida.

17.    On or around August 30, 2018, Plaintiffs purchased a new 2018 Highlander XL from Groove Toyota, an authorized Toyota dealer in Englewood, Colorado.

18.    Plaintiffs purchased their vehicle for personal, family, or household use.

19.    Before purchase, Mr. Murphy test drove a 2018 Highlander and reviewed the vehicle's Monroney sticker (a.k.a. window sticker). He researched the vehicle online, including the Motor Trend website, and also reviewed brochures authored by Defendants regarding their vehicle. Plaintiffs believed that the Highlander would be a safe and reliable vehicle.

20.    Toyota's omissions were material to Plaintiffs. Had Toyota disclosed its knowledge of the 8AT Transmission Defect before Mr. and Mrs. Murphy purchased their Highlander, Mr. and Mrs. Murphy would have seen and been aware of the disclosures. Furthermore, had they known of the 8AT Transmission Defect, Mr. and Mrs. Murphy would not have purchased their vehicle or would have paid less for it.

21.    Within a week after purchase, Plaintiffs' vehicle exhibited hesitation and surging when driving at low speeds, in stop-and-go traffic and when accelerating to join a traffic flow.

22.    On or around September 27, 2018, with approximately 2,000 miles

CLASS ACTION COMPLAINT

on the odometer, Mr. Murphy took their vehicle to Peterson Toyota of Sarasota (formerly Germain Toyota of Sarasota), reporting that the vehicle was exhibiting severe hesitation and surging while driving at residential speeds. The dealership ran diagnostic tests and produced a diagnostic report, advising that the vehicle was operating normally and no anomalies could be found.

23.    Thereafter, on or around January 21, 2019 with approximately 8,730 miles on the odometer, Mr. Murphy took their vehicle to Toyota of Sarasota, complaining that the vehicle demonstrated erratic throttle responses at low speeds, stumbling (*i.e.*, hesitating) and exhibiting surges when lightly applying the throttle at parking lot speeds.  The dealership again did not make any repairs, determining that "no problem [was] found at this time. Normal operation."  On or around April 3, 2019, Mr. Murphy returned the vehicle to Toyota of Sarasota, reiterating that the vehicle was demonstrating erratic throttle responses, stumbling and surging at low speeds.  Although the dealership reported no problems with the vehicle, a senior technical service adviser informed Mr. Murphy that the problems complained of were common to Highlanders and other Toyota models and were well-known to Toyota and its dealers.

24.    On or around May 29, 2019, Mr. Murphy returned to Toyota of Sarasota, complaining of the continuing problems with his vehicle and requested that the vehicle be repaired or that Toyota buy back the vehicle. The dealership did not perform any diagnostics or repair services, but instead scheduled an inspection by a Toyota representative. On or around May 31, 2019, with approximately 11,930 miles on the odometer, Mr. Murphy took the vehicle to Toyota of Sarasota to have it inspected by a Toyota District 2 Fixed Operations Manager. The Operations Manager test drove the vehicle but made no repairs, reporting that he "found it to perform like a known good vehicle" and did "not exhibit any warrantable concern."  The Operations Manager went on to explain

CLASS ACTION COMPLAINT

that "today's vehicles . . . are driven by wire which means they do not have a throttle cable so they may exhibit very slight lag due to the ECM processing. The current eight speeds transmissions are gear to keep the engine in an optimum operating condition which may not meet the customers desired performance but in every case, a little extra pressure on the gas pedal improves responsiveness and customer satisfaction can usually be obtained."

25.    On or around October 11, 2019, with approximately 22,005 miles on the odometer, Mr. Murphy took their vehicle to Pinehurst Toyota in Southern Pines, North Carolina, again complaining that the vehicle continued to exhibit erratic throttle responses at low speeds, stumbling, and exhibiting surges when lightly applying the throttle at low speeds. The dealership service technician noted that the transmission problems were "caused by: internal failure on transaxle assembly" and consequently "replaced [the] transaxle assembly and associated parts per bulletin T-SB-0160-18."

26.    Following the dealership visits, Plaintiffs' vehicle has continued to exhibit the 8AT Transmission Defect including hesitation and surging when driving at low speeds, in stop-and-go traffic and when accelerating to join a traffic flow. In particular, after the October 2019 transmission transaxle assembly replacement, Plaintiffs' vehicle has performed even more poorly than before the replacement.

27.    At all times, Plaintiffs, like all Class Members, have driven their vehicle in a foreseeable manner in the sense that Mr. and Mrs. Murphy have not abused their vehicle or used it for purposes unintended by Toyota such as drag racing, for example. However, despite this normal and foreseeable driving, the 8AT Transmission Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Defendants**

28.    Defendant Toyota Motor Sales, U.S.A., Inc.("TMS"), is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. TMS is headquartered at 6565 Headquarters Dr, Plano, TX 75024. TMS designs and manufactures motor vehicles, parts, and other products for sale in California, in the United States, and throughout the world. TMS is the warrantor and distributor of the Class Vehicles in California.

29.    Defendant Toyota Motor North America, Inc. ("TMNA"), is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. TMNA is headquartered at 6565 Headquarters Dr, Plano, TX 75024. According to Toyota's official website, TMNA "brings together Toyota's marketing, sales, engineering and manufacturing arms in North America on one shared, state-of-the-art campus."

30.    Founded in 1937 and headquartered in Toyota City, Japan, Defendant Toyota Motor Corporation ("TMC") is a corporation organized under the laws of Japan. TMC manufacturers and distributes automobiles and is the parent company.

31.    Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide and in Colorado.

32.    At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Riverside County and throughout the United States of America.

CLASS ACTION COMPLAINT

## JURISDICTION

33. This is a class action.

34. Members of the proposed Class, which includes citizens of Colorado, are citizens of states other than Texas, where TMS and TMNA are headquartered, and California, where TMS and TMNA are incorporated.

35. On information and belief, aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

36. This Court has personal jurisdiction over Defendants because at least one of them is a California corporation registered to conduct business in California, and/or they all have sufficient minimum contacts with California, and otherwise intentionally avail themselves of the markets within California, through the promotion, sale, marketing and distribution of its vehicles in California, so as to render the exercise of jurisdiction by this Court proper and necessary.

37. Accordingly, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

38. Toyota, through its business of distributing, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate. Toyota is deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

## FACTUAL ALLEGATIONS

39. Since 2016, Toyota has designed, manufactured, distributed, sold, and leased the Class Vehicles. Toyota has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Colorado and nationwide. Toyota warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

40.     Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealerships; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealerships are Defendant's agents for sales and repairs. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

41.     The Class Vehicles are equipped with Toyota's Direct Shift-8AT, a transverse, eight-speed transmission, which Toyota developed in a joint venture with Aisin AW, a third-party transmission manufacturer. As noted in Aisin's June 2019 summary of its major powertrain products, this high torque capacity transmission is for use in Toyota Highlander and Sienna vehicles.[7]

42.     In 2016, Toyota touted the Direct Shift-8AT transmission as a new technology that would provide customers with "quick and smooth response to accelerator pedal operation" which would "create[] an 'as desired' direct driving feel.."[8] In practice, however, Toyota's Direct Shift-8AT Transmission is plagued by numerous problems and safety concerns.

43.     On information and belief, in response to heightened consumer demand and governmental pressure to reach unprecedented miles-per-gallon ratings, Toyota attempted to create an 8-speed transmission for a compact, transverse application by using a single axis and only two planetary gears, rather than the typical four. Unfortunately, while Toyota touted the resulting Direct Shift 8AT transmission as "achieving one of the world's best transmission efficiencies" that "lower[] a vehicle's fuel requirements" and even improving "straight driving" and "cornering stability,"[9] in practice, the new transmission

---

[7] *Available at* https://www.aisin-aw.co.jp/en/corporate/module/pdf/corporate/summary/index/data.pdf

[8] *Available at* https://global.toyota/en/powertrain/transmission/

[9] *Id.*

design causes harsh and delayed shifting, delayed and unpredictable and unintended acceleration, jerking, lurching forward, lack of power, and other symptoms listed *supra*.

44.    For years, and since the Class Vehicles were first released or shortly thereafter, scores of class members have complained of the defect to the NHTSA and elsewhere. For example, the 2017 Highlander owner below reported in NHTSA ID 11129582:

> 2017 HIGHLANDER LIMITED. 11,800 MILES. OVER THE LAST 30 DAYS THE VEHICLE HAS HAD 3 SIMILAR EVENTS OF VEHICLE HESITATION OR STUMBLING FROM A FULL STOP, WHEN APPLYING FULL ACCELERATOR PEDAL TRAVEL. THE VEHICLE SEEMS TO ACCELERATE NORMALLY FOR A SECOND OR TWO, THEN JUST SEEMS TO HANG AT 5-10 MPH. PUMPING THE ACCELERATOR PEDAL QUICKLY FULL UP, FULL DOWN MAY HAVE FIXED THE PROBLEM, I'M NOT REALLY SURE, BUT THAT IS WHAT I DID.THE VEHICLE OPERATES NORMALLY AFTER THAT.IN THE LAST AND MOST FRIGHTENING EPISODE, I WAS AT A STOP,ON A SIDE STREET WAITING TO TURN ONTO A FRONTAGE ROAD WHERE TYPICAL SPEEDS ARE 60 MPH. I PRESSED THE ACCELERATOR PEDAL FULL DOWN TO THE FLOOR AND TURNED ONTO THE FRONTAGE ROAD. THE VEHICLE SEEMED TO ACCELERATE NORMALLY FOR 1-2 SECONDS, THEN AS BEFORE, JUST STAYED AT 5-10 MPH WITH A CAR COMING UPON MY REAR AT 60 MPH. FORTUNATELY FOR ME HE WAS ABLE TO CHANGE LANES AND AVOID RUNNING INTO ME. I PUMPED THE ACCELERATOR PEDAL AS DESCRIBED. THE VEHICLE THAN RESPONDED NORMALLY. I DON'T REMEMBER IF THE VEHICLE WAS IN POWER OR ECONOMY MODE. I TYPICALLY PUT IT INTO POWER MODE BEFORE ENTERING THE HIGHWAY (WHICH I WAS ABOUT TO DO ON THE FAR SIDE OF THE FRONTAGE ROAD) IF I REMEMBER. AS YOU MAY IMAGINE THIS LAST EPISODE LEFT ME QUITE DISTURBED. I ALWAYS USE REGULAR GRADE GASOLINE FROM TOP NAME GAS STATIONS. THESE EVENTS HAPPENED WITH DIFFERENT TANKS OF GAS FROM DIFFERENT STATIONS. I TOOK THE VEHICLE TO THE DEALERSHIP. THEY WERE NOT ABLE TO READ ANY ERROR CODES FROM THE COMPUTER, AND

CLASS ACTION COMPLAINT

1
2

WERE UNABLE TO REPEAT THE PROBLEM IN A TEST DRIVE. THEY HAVE ESCALATED THE CASE TO THE TOYOTA ENGINEERING TEAM.

3

45.    The Direct Shift 8AT is comprised of two planet gear sets. The first

4

set from the input side is a conventional planetary, followed by a Ravigneau

5

(double) planetary. When this arrangement is used, it creates what is termed a

6

"LePelletier" gear set. Typically, a LePelletier gear set will achieve six forward

7

speeds and one reverse. In the Class Vehicles, the transmission utilizes holds on

8

some of the rotating elements, thus creating a "modified LePelletier" gear set

9

with eight forward speeds.

10

46.    The 8AT Transmission Defect exposes Plaintiffs and Class

11

Members to a safety hazard and renders their vehicles unreasonably dangerous

12

due to the unsafe conditions the Defect causes, including hesitation, delayed and

13

unpredictable and unintended acceleration, jerking and lurching, harsh and

14

delayed engagement, and lack of power.

15

47.    The 8AT Transmission Defect affects the vehicles' safety because,

16

among other reasons, there are situations that require the ability to accelerate

17

rapidly (e.g., merging onto the highway and changing lanes) in which the

18

vehicles' delayed response poses a serious safety risk.

19

48.    The Class Vehicles' 8AT Transmission utilizes high fluid pressure

20

to actuate shifts. The pressure is produced by a hydraulic pump regulated by a

21

pressure relief valve. The valve body, in turn, is electronically controlled by the

22

PCM. In order to engage the clutch packs and actuate shifts in response to driver

23

input, the valve body applies pressure by activating solenoids at precise times to

24

open hydraulic valves inside the valve body at varying pressure ramp-up rates.

25

However, improper calibration between the PCM and transmission prevents the

26

valve body from applying appropriately timed pressure, which in turn prevents

27

the various gears' clutch packs from being actuated in time. On information and

28

CLASS ACTION COMPLAINT

belief, this causes the symptoms of "shift shock" and delays before engagement of gears, as well as other symptoms of the 8AT Transmission defect.

49.   The 8AT Transmission Defect alleged is inherent in and the same for all Class Vehicles.

50.   The 8AT Transmission Defect is material to consumers because it presents a serious safety concern. For example, delayed and unintended acceleration, unpredictable engagement and shifting, jerking, lurching, and lack of power severely affect the driver's ability to control the car's speed, acceleration, and deceleration, and can make it difficult to safely merge into traffic or to turn left across incoming traffic.

51.   Class Member complaints to NHTSA, cited *infra*, demonstrate the unsafe and widespread nature of the 8AT Transmission Defect.

**I.    Toyota Had Superior and Exclusive Knowledge of the 8AT Transmission Defect**

52.   Toyota had superior and exclusive knowledge of the 8AT Transmission Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

53.   Plaintiffs are informed and believe, and based thereon allege that before Plaintiffs purchased their Class Vehicle, and since 2016, if not earlier, Toyota knew about the 8AT Transmission Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Toyota and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from Toyota dealers about the problem. Publicly available facts set forth *infra* further confirm Toyota's knowledge.

54.   Toyota is experienced in the design and manufacture of consumer

vehicles. As an experienced manufacturer, Toyota conducts tests, including pre-sale durability testing, on incoming components, including the Direct Shift-8AT Transmissions, to verify the parts are free from defect and align with Toyota's specifications.  Thus, Toyota knew or should have known that the subject Direct Shift-8AT Transmissions were defective and prone to put drivers in a dangerous position due to the inherent risk of the defect.

55.    Additionally, Toyota should have learned of this widespread defect from the sheer number of reports received from dealerships and from customer complaints directly to Toyota. Toyota's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

56.    Toyota's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Toyota's policy that when a repair is made under warranty the dealership must provide Toyota with detailed documentation of the problem and the fix employed to correct it in order to be reimbursed. Dealerships have an incentive to provide detailed information to Toyota, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

A.    **Toyota's Technical Service Bulletins Concerning the Class Vehicles and Attempted Ineffectual Fixes**

57.    Toyota quietly issues notifications to its dealerships – but not consumers – called Technical Service Bulletins ("TSBs.") Through TSBs, Toyota provides directions to its authorized dealerships for how to respond to customer complaints and requests for repairs.

58.    Shortly after release of the 2017 model year Highlander and Sienna

vehicles in 2016, Consumer Reports tested them and noted that:

> The transmission made the engine rev before upshifting, especially from second to third gear, even under light acceleration. This delayed shifting increased engine noise and made driving rather unpleasant.[10]

59.    When Consumer Reports' staff members test drove the vehicles "they routinely asked 'What's wrong with this transmission?'" *Id*. As a result, in December of 2016 Consumer Reports shared its experience with Toyota. According to Consumer Reports, "[t]he company re-evaluated the transmission and agreed with our finding."

60.    On February 20, 2017, Toyota issued T-SB-0187-17, titled "High RPM Shift Point" that applied to the 2017 Sienna. This TSB is attached as **Exhibit 1.** The TSB stated that "Some 2017 model year Sienna vehicles may exhibit the following conditions: • Lack of power from stop • High RPM shift points at 2 – 3 shift • Hesitation in lower gears • Holds gear too long." This TSB called for a software update to modify the PCM logic for the Sienna. On information and belief, this TSB failed to resolve the 8AT Transmission Defect. This TSB was not issued as part of a formal recall or service campaign.

61.    On March 2, 2017, Toyota issued T-SB-0194-17, titled "Lack of Power/High RPM Shift Point/Hesitation" that applied to the 2017 Highlander. This TSB is attached as **Exhibit 2.** The TSB stated that "Some 2017 model year Highlander vehicles may exhibit the following conditions: • Lack of power. • High RPM shift point at the 2 – 3 shift. • Hesitation in low gears." This TSB called for a software update to modify the PCM logic for the Highlander. On information and belief, this TSB failed to resolve the 8AT Transmission Defect. This TSB was not issued as part of a formal recall or service campaign.

---

[10]  *See* https://www.consumerreports.org/toyota/2017-toyota-highlander-sienna-transmissions-updated-to-shift-smoother/.

62.     Although Consumer Reports noted the software update made a difference, it concluded "[u]nfortunately, we found that shifting remains less smooth for both compared with the previous six-speed automatic in pre-2017 models, even after the update." On information and belief, any improvement was inadequate and temporary at best, and these software updates failed to resolve transmission issues which continue to plague both the Highlander and Sienna. Indeed, both vehicles have been the subject of additional service bulletins regarding similar transmission issues (*e.g.*, harsh shifting, reduced power, etc).

63.     On December 17, 2018, Toyota issued TSB 0160-18, "Transaxle Whine Noise, Harsh Shift, MIL ON, or Reduced Power" that applied to the 2017-2018 Toyota Highlander and Toyota Sienna. This TSB is attached as **Exhibit 3.** Toyota issued this TSB in response to those vehicles exhibiting a harsh shift, reduced power, a whine noise while driving, and a malfunction indicator lamp illuminating. In this TSB, Toyota directed its authorized dealerships to replace the transmissions with a "remanufactured" transmission where applicable. On information and belief, this TSB failed to resolve the 8AT Transmission Defect. This TSB was not issued as part of a formal recall or service campaign.

64.     On April 18, 2019, Toyota issued "Customer Support Program ZJC" as part of Toyota's "continuing efforts to ensure the best in customer satisfaction." Under the Program, Toyota agreed to provide additional warranty coverage for the transmission on 2017-2018 Model Year Toyota Sienna and Highlander vehicles for damage caused by an insufficiently bent washer tab within the transmission. Toyota acknowledged that it "has received reports about potential symptoms, such as a whine noise from the transmission while driving, harsh shifting, reduced power, and master warning light/check engine light illumination...."

65.    On information and belief, neither the TSBs nor the Customer Support Program resolved the 8AT Transmission Defect.

**B.    Toyota's TSBs for Other Non-Class Vehicles Equipped With the Direct Shift-8AT Transmission**

66.    The TSBs listed *supra*, all of which are specific to the Class Vehicles, demonstrate and establish Toyota's pre-sale knowledge of the Defect. As a supplement and for further context, Plaintiffs also list below the TSBs that Toyota issued for *other* Toyota-made vehicles equipped with the same or substantially similar UA80 / UB80 Direct Shift-8AT Transmission. These TSBs further indicate that Toyota was aware of the problem inherent in this transmission:

67.    On February 8, 2017, Toyota issued a TSB regarding the 2016 to 2017 Lexus RX 350. In the TSB, entitled "ECM Calibration: Hesitation Concerns," No. L-SB-0109-17, Toyota notified its dealerships that the 2016-2017 RX 350 Vehicles were exhibiting "a hesitation in one or more of the following conditions:

- Accelerating from a stop.
- Passing during freeway/city driving.
- Low speed reacceleration."

68.    In the TSB, consistent with Plaintiffs' description of the 8AT Transmission Defect, Toyota advises dealerships that the "Engine Control Module (ECM, SAE term: Powertrain Control Module/PCM) calibration has been revised to address these conditions."  As noted in the TSB, Toyota uses the terms Powertrain Control Module and Engine Control Module interchangeably.

69.    On February 8, 2019, Toyota issued a TSB regarding the 2019 Lexus RX350 entitled "Harsh Engagement Into Drive." In the TSB, Toyota informed its dealerships that the 2019 RX 350 vehicles were exhibiting "harsh

engagement when shifting into drive" and that the vehicles' computers were indicating "Pressure Control Solenoid "A" Actuator Stuck off." Consumers often describe harsh engagement when shifting into gear as "jerking" or "jerking into gear." In response, Toyota directed its dealerships to update the vehicles' Powertrain Control Module software, which Toyota had again modified to address the 8AT Transmission Defect.

70.    On July 2, 2019, Toyota issued a TSB to its dealerships specific to the 2016-2019 Lexus RX 350. The TSB was entitled "Vehicle Bucking on 1 – 2 and/or 2-3 Upshifts and Surge Between 0 – 46 mph." In the TSB, Toyota notified its dealerships that the 2016-2019 RX 350 vehicles were exhibiting "one or both of the following conditions:

- A bucking feeling (back and forth jerking that comes right after a shift but then dissipates quickly after 1-2 and/or 2-3 upshifts)
- A surge feeling (back and forth rocking that is not associated with transmission shifts) when the vehicle is traveling between 0 – 46 mph, transmission is in 3rd – 8th gear, and torque converter is in full lock-up."

71.    On information and belief, theses TSBs have been ineffective. For example, RX 350 Vehicle owners discussing TSB L-SB-0109-17 online complained of its inefficacy. Below is an example of such a complaint, and others appear *infra* (spelling / grammar errors corrected):

> "Doesn't hurt to try the TSB, but it has also NOT worked for some, including me. I've had it applied correctly, and it's not a permanent fix. I consider the TSB a failure."[11]

72.    In response, Toyota directed its dealerships to update the Powertrain

---

[11] https://www.clublexus.com/forums/rx-4th-gen-2016-present/808183-hesitation-problem-at-various-speeds-tsb-info-post-159-a-28.html#post9877542

1  Control Module software, which Toyota had again modified to address the 8AT
2  Transmission Defect.

3      73.    On December 11, 2017, Toyota issued TSB 0330-17, "SHIFT
4  SHOCK ON INITIAL STARTUP OR REACCELERATION." Toyota issued
5  this TSB to address customer complaints regarding the Direct Shift-8AT
6  Transmission. The TSB provided that "some 2018 model year Camry vehicles
7  may exhibit a shift shock from Park to Reverse on initial startup or delay/shock
8  when reaccelerating quickly after slowing down to a stop or near stop. The
9  Engine Control Module (ECM) (SAE term: Powertrain Module [PCM]) logic has
10 been updated to address this condition." On information and belief, this TSB
11 failed to resolve the 8AT Transmission Defect. This TSB was not issued as part
12 of a formal recall or service campaign.

13     74.    On January 8, 2018, Toyota issued TSB 00001-18. Toyota issued
14 this TSB to address concerns of "harsh shift or shift flare" after transmission
15 replacements due to a software mismatch.

16     75.    On February 2, 2018, Toyota released T-SB-0010-18 that address
17 concerns of "harsh shift or shift flare" after transmission replacements in 2018
18 Camrys due to a software mismatch and acknowledges that mismatched Engine
19 Control Module (ECM), also called the Power Control Module (PCM), software
20 and transaxle assembly combinations may result in a harsh shift or shift flare.
21 While this TSB purports to provide a method for correctly matching the PCM
22 calibration and transaxle, on information and belief there are no PCMs for the
23 Class Vehicles that are correctly calibrated for the Class Vehicles' transaxle
24 assemblies. This TSB was also not issued as part of a formal recall or service
25 campaign.

26
27
28

CLASS ACTION COMPLAINT

**C.     Consumer Complaints Reported to NHTSA and on Third-Party Websites**

76.     In addition, Toyota monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

77.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, Toyota knew or should have known of the many complaints about the 8AT Transmission Defect logged by NHTSA Office of Defect Investigation (ODI), and the content, consistency, and large number of those complaints alerted, or should have alerted, Toyota to the 8AT Transmission Defect.

78.     Attached as **Exhibit 4** are some examples of the complaints that owners and lessees of the Class Vehicles have made to NHTSA concerning the 8AT Transmission Defect:

79.     Class Vehicle owners also reported the 8AT Transmission Defect in online forums, examples of which are attached as **Exhibit 5**.

80.     The existence of the 8AT Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the 8AT Transmission Defect, they would have paid less for the Class Vehicles or would

1    not have purchased or leased them.

2        81.    Reasonable consumers, like Plaintiffs, reasonably expect that a

3    vehicle's Direct Shift-8AT Transmissions are safe, will function in a manner that

4    will not pose a safety risk, and are free of defects, all of which was not true with

5    respect to the Direct Shift-8AT Transmissions in the Class Vehicles. They also

6    expected that the Class Vehicles would be fit for the ordinary purpose of driving

7    their Class Vehicles with normal and reliable acceleration and deceleration, and

8    without harsh or delayed shifting and engagement, delayed acceleration,

9    hesitation, jerking, unintended acceleration, lurching, and excessive revving

10   before upshifting which they were not due to the 8AT Transmission Defect.

11   Plaintiffs and Class Members further reasonably expect that Toyota will not sell

12   or lease vehicles with known safety defects, such as the 8AT Transmission

13   Defect, and will disclose any such defects to its consumers when it learns of

14   them. They did not expect Toyota to fail to disclose the 8AT Transmission

15   Defect to them and to continually deny it.

16   **II.    Toyota Has Actively Concealed the 8AT Transmission Defect**

17       82.    Despite its knowledge of the 8AT Transmission Defect in the Class

18   Vehicles, Toyota actively concealed the existence and nature of the defect from

19   Plaintiffs and Class Members. Specifically, Toyota failed to disclose or actively

20   concealed at and after the time of purchase, lease, or repair:

21           (a)    any and all known material defects or material nonconformity

22                  of the Class Vehicles, including the defects pertaining to the

23                  Direct Shift-8AT Transmissions;

24           (b)    that the Class Vehicles, including the Direct Shift-8AT

25                  Transmissions, were unsafe, not in good in working order,

26                  were defective, were in need of repair and possibly

27                  recalibration or other software mechanisms, and were not fit

28

for their intended purposes; and

(c)    that the Class Vehicles and the Direct Shift-8AT

Transmissions were defective, despite the fact that Toyota

learned of such defects as early as 2017.

## CLASS ACTION ALLEGATIONS

83.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

84.    The Class and Sub-Class are defined as:

> **Class**:  all persons in the United States who purchased any 2017 to present Toyota Highlander or any 2017 to present Toyota Sienna ("the Class Vehicles").

> **Colorado Sub-Class**:  All persons who purchased any 2017 to present Toyota Highlander or any 2017 to present Toyota Sienna in the State of Colorado.

85.    Excluded from the Class and Sub-Class are: (1) Defendants, any entity or division in which Defendants has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

86.    Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims

of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

87.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Toyota. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Transmissions. Furthermore, the factual bases of Toyota's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

88.    <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)    Whether Class Vehicles suffer from defects relating to the Direct Shift-8AT Transmissions;

(b)    Whether the defects relating to the Direct Shift-8AT Transmissions constitute an unreasonable safety risk;

(c)    Whether Defendants knows about the defects pertaining to the Direct Shift-8AT Transmissions and, if so, how long Defendants has known of the defect;

(d)    Whether the defective nature of the Direct Shift-8AT Transmissions constitutes a material fact;

(e)    Whether Defendants has a duty to disclose the defective nature of the Direct Shift-8AT Transmissions to Plaintiffs and

Class Members;

(f)    Whether Defendants knew or reasonably should have known of the defects pertaining to the Direct Shift-8AT Transmissions before they sold and leased Class Vehicles to Class Members;

(g)    Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective Direct Shift-8AT Transmissions;

(h)    Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective Direct Shift-8AT Transmissions;

(i)    Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(j)    Whether Defendants breached the implied warranty of merchantability under Colorado law;

89.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and he intends to prosecute this action vigorously.

90.    <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of

litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION

### (Breach of Implied Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq.*)

91.    Plaintiffs incorporate by reference the allegations contained in the preceding sections of the complaint.

92.    Plaintiffs bring this Count on behalf of themselves and the Class, or alternatively, the Colorado Sub-Class against TMS.

93.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

94.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

95.    TMS is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

96.    TMS impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Direct Shift-8AT Transmissions were manufactured, supplied, distributed, and/or sold by Toyota would provide safe and reliable transportation; and (ii) a warranty that the Class

Vehicles and their Direct Shift-8AT Transmissions would be fit for their intended use while the Class Vehicles were being operated.

97. Contrary to the applicable implied warranties, the Class Vehicles and their Direct Shift-8AT Transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design of their Direct Shift-8AT Transmissions.

98. TMS's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

99. The amount in controversy of Plaintiffs' individual claims and those of each class member meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

100. TMS has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Direct Shift-8AT Transmissions.

101. As a direct and proximate cause of TMS's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. TMS's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

102. Because of TMS's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

## SECOND CAUSE OF ACTION

### (Breach of Implied Warranty (Colorado))

103.   Plaintiffs incorporate by reference the allegations contained in the preceding sections of the complaint.

104.   Plaintiffs bring this Count on behalf of themselves and members of the Class, or alternatively, the Colorado Sub-Class.

105.   Toyota impliedly warranted that the Class Vehicles were merchantable, fit and safe for their ordinary use, not otherwise injurious to consumers, and equipped with adequate safety warnings.

106.   Privity of contract is not required in this case, because Plaintiffs and Class Members are intended third-party beneficiaries of contracts between TMS and its dealerships; specifically, they are the intended beneficiaries of Defendants' implied warranties. Toyota's vehicles are sold to consumers through a network of TMS's authorized dealerships, who are TMS's agents for sales and repairs. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

107.   Because the Class Vehicles are equipped with a defective Direct Shift-8AT Transmission, the vehicles purchased or leased and used by Plaintiffs and the Colorado Sub-Class are unsafe, unfit for their ordinary use when sold, and not merchantable. Toyota breached the implied warranty of merchantability, as stated in the Uniform Commercial Code, by selling or leasing Class Vehicles to Plaintiffs and the Colorado Sub-Class.

108.   Plaintiffs and the Colorado Sub-Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and any other relief to which Plaintiffs and the Colorado Sub-Class may be entitled.

**THIRD CAUSE OF ACTION**

**(Violation of the Colorado Consumer Protection Act**

**(Colo. Rev. Stat. §§ 6-1-101, *et seq.*)**

109.   Plaintiffs incorporate by reference the allegations contained in the preceding sections of the complaint.

110.   Plaintiffs bring this Count on behalf of themselves and members of the Class, or alternatively, the Colorado Sub-Class.

111.   At all times, Defendants were and are "person[s]" within the meaning of the Colorado Consumer Protection Act ("CCPA"), COLO. REV. STAT. § 6-1-102.

112.   The CCPA prohibits a person from engaging in a "deceptive trade practice," including "knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods […];" "represent[ing] that goods, good, services, or property are of a particular standard, quality, or grade, […] if he knows or should know that they are of another;" and "advertis[ing] goods, services, or property with intent not to sell them as advertised." COLO. REV. STAT. § 6-1-105(1)(e), (g), and (i).

113.   Toyota participated in deceptive trade practices that violated the CCPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Toyota knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Toyota systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

114.   Toyota also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

115.   Toyota's unfair and deceptive acts or practices occurred repeatedly in Toyota's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

116.   Toyota knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

117.   Toyota knew or should have known that its conduct violated the CCPA.

118.   Defendants were under a duty to Plaintiffs and the Colorado Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and the Colorado Sub-Class Members at the time of sale and thereafter.

119.   In failing to disclose the defective nature of the Direct Shift-8AT Transmissions, Toyota knowingly and intentionally concealed material facts and breached its duty not to do so.

CLASS ACTION COMPLAINT

120.   The facts about the 8AT Transmission Defect that the Toyota concealed from, or failed to disclose to, Plaintiffs and other members of the Colorado Sub-Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less.  Had Plaintiffs and other members of the Colorado Sub-Class known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

121.   Plaintiffs and other members of the Colorado Sub-Class are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit problems such as: rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; sudden loss of power; premature transmission wear; and eventually, transmission failure. This is the reasonable and objective consumer expectation relating to vehicle transmissions.

122.   As a result of Toyota's conduct, Plaintiffs and other members of the Colorado Sub-Class were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and may continue to experience problems such as: harsh or delayed shifting and engagement, delayed acceleration, hesitation, jerking, unintended acceleration, lurching, excessive revving before upshifting (also known as excessively high RPM shift points), and lack of power when needed, premature transmission wear; and eventually, transmission failure.

123.   As a result of their reliance on Toyota's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the 8AT Transmission Defect, Plaintiffs and other members of the Colorado Sub-Class

1  were harmed and suffered actual damages in that the Class Vehicles'

2  transmission components are substantially certain to fail before their expected

3  useful life has run and Class Members have incurred or will incur the cost of

4  repairing or replacing the defective transmission.

5      124.  As a direct and proximate result of Toyota's unfair or deceptive acts

6  or practices alleged herein, Plaintiffs and other members of the Colorado Sub-

7  Class suffered and will continue to suffer actual damages and are entitled to

8  recover actual damages to the extent permitted by law, including class action

9  rules, in an amount to be proven at trial. In addition, Plaintiffs and the putative

10  Class seek equitable and injunctive relief against Toyota on terms that the Court

11  considers reasonable, and reasonable attorneys' fees.

12  **FOURTH CAUSE OF ACTION**

13  **(Fraudulent Omission (Colorado))**

14      125.  Plaintiffs incorporate by reference the allegations contained in the

15  preceding sections of the complaint.

16      126.  Plaintiffs bring this cause of action on behalf of themselves and the

17  Class, or, in the alternative, the Colorado Sub-Class.

18      Toyota knew that the Class Vehicles' transmissions suffered from an

19  inherent defect, were defectively designed and/or manufactured and were not

20  suitable for their intended use.

21      127.  Toyota concealed from and failed to disclose to Plaintiffs and

22  Class Members the defective nature of the Class Vehicles and their

23  transmissions.

24      128.  Toyota was under a duty to Plaintiffs and Class Members to

25  disclose the defective nature of the Class Vehicles' transmissions because:

26          a)  Toyota was in a superior position to know the true state of facts

27          about the safety defect contained in the Class Vehicles'

28

transmissions;

b) Toyota made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the transmissions; and

c) Toyota actively concealed the defective nature of the Class Vehicles' transmissions from Plaintiffs and Class Members.

129.   The facts concealed or not disclosed by Toyota to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lesser price for them. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles' transmissions, they would not have purchased or leased the Class Vehicles or would have paid less for them.

130.   Toyota concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles' transmissions in order to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Toyota's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of defective Class Vehicles.

131.   Toyota continued to conceal the defective nature of the Class Vehicles' transmissions even after Class Members began to report the problems. Indeed, Toyota continues to cover up and conceal the true nature of the problem today.

132.   As a direct and proximate result of Toyota's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

## RELIEF REQUESTED

133.   Plaintiffs, on behalf of themselves and all others similarly situated,

request the Court to enter judgment against Toyota, as follows:

       (a)    An order certifying the proposed Class and Sub-class, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

       (a)    An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

       (b)    Any and all remedies provided pursuant to a breach of implied warranty under Colorado law;

       (c)    Any and all remedies provided pursuant to Colo. Rev. Stat. §§ 6-1-101, *et seq.*;

       (d)    Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

       (e)    An award of attorneys' fees and costs, as allowed by law;

       (f)    An award of pre-judgment and post-judgment interest, as provided by law;

       (g)    Leave to amend the Complaint to conform to the evidence produced at trial; and

       (h)    Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

134.   Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiffs demand a trial by jury of all issues in this action so triable.

1

2   Dated:  June 30, 2020                          Respectfully submitted,

3                                                  Capstone Law APC

4

5                                          By: /s/ Cody R. Padgett

6                                              Steven R. Weinmann
                                               Tarek H. Zohdy
7                                              Cody R. Padgett
                                               Trisha K. Monesi

8                                              BERGER MONTAGUE PC
                                               Russell D. Paul (*PHV forthcoming*)
9                                              rpaul@bm.net
                                               Amey J. Park (*PHV forthcoming*)
10                                             apark@bm.net
                                               1818 Market Street
11                                             Suite 3600
                                               Philadelphia, PA 19103
12                                             Tel:  (215) 875-3000
                                               Fax:  (215) 875-4604

13                                             GLANCY PRONGAY & MURRAY LLP
14                                             Lionel Z. Glancy (SBN 134180)
                                               Marc L. Godino (SBN 182689)
15                                             Danielle L. Manning (SBN 313272)
                                               1925 Century Park East, Suite 2100
16                                             Los Angeles, California 90067
                                               Telephone: (310) 201-9150
17                                             Facsimile: (310) 201-9160
                                               E-mail: info@glancylaw.com

18                                             GREENSTONE LAW APC
19                                             Mark S. Greenstone (SBN 199606)
                                               1925 Century Park East, Suite 2100
20                                             Los Angeles, California 90067
                                               Telephone: (310) 201-9156
21                                             Facsimile: (310) 201-9160
                                               E-mail: mgreenstone@greenstonelaw.com

22                                             Attorneys for Plaintiffs

23

24

25

26

27

28

CLASS ACTION COMPLAINT